UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| SHEILA FRANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 04-221-P-S |
| | ) | |
| L.L. BEAN, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## RECOMMENDED DECISION ON L.L. BEAN'S
## MOTION FOR SUMMARY JUDGMENT

On October 13, 2004, Sheila Frank filed a civil action against her former

employer, L.L. Bean, alleging sex discrimination in the workplace and tolerance of a

retaliatory hostile work environment following Frank's participation in an interview

protected by Title VII of the Civil Rights Act and the Maine Human Rights Act.  Frank's

administrative claim was dismissed by the Maine Human Rights Commission for lack of

jurisdiction.  Now pending is L.L. Bean's motion for summary judgment.  I recommend

that the Court grant the motion because Frank's discrimination claim is time barred and

her retaliatory hostile work environment claim is not supported by the record.

### Facts

The following statement of facts is drawn from the parties' Local Rule 56

statements of material fact in accordance with this District's summary judgment practice.

See Doe v. Solvay Pharms., Inc., 350 F. Supp. 2d 257, 259-60 (D. Me. 2004) (outlining

the procedure).  Pursuant to Rule 56 of the Federal Rules of Civil Procedure, all

evidentiary disputes appropriately generated by the parties' statements have been

resolved, for purposes of summary judgment only, in favor of the non-movant.

Merchants Ins. Co. v. United States Fid. & Guar. Co., 143 F.3d 5, 7 (1st Cir. 1998).

Sheila Frank worked in L. L. Bean's returns department, first as a returns processor between 1994 and 1997, and then as a supervisor between 1997 and April 7, 2003.[1]  (Def.'s Statement of Material Facts (Stmt.) ¶ 1, Docket No. 80.)  Frank's direct supervisor was Mark Allen until Mark Allen resigned from L. L. Bean in March 2003, at which point Ray Giandrea moved up the organizational chart to become Frank's direct supervisor.  (Id. ¶ 2.)  Higher up the organizational hierarchy was David Allen, Mark Allen's direct supervisor, and Diane Bilodeau, David Allen's direct supervisor and general supervisor of the entire returns department.  (Id. ¶ 3.)  Higher still, Mike Perkins served as Vice President of Returns and Distribution.  (Pl.'s Opposing Statement of Material Facts (Opp. Stmt.) ¶ 3, Docket No. 144.)

Frank contends that David Allen discriminated against her on the basis of sex beginning in 2001, and continuing on virtually a daily basis until he was terminated in November of 2002.  (Stmt. ¶ 8; Opp. Stmt. ¶ 8; see also Pl.'s Additional Statement (Add'l Stmt.) ¶¶ 190.)  L.L. Bean terminated David Allen's employment on November 8, 2002, based on an investigation into his management relationship with female employees that involved several employee interviews, including an interview with Frank.  (Stmt. ¶¶ 9-10, 13-14; Opp. Stmt. ¶¶ 9-11, 13-14.)

---

[1]      I embark on this statement of facts with some trepidation, for, although it is obviously material whether Frank ever, in fact, worked for L.L. Bean, Frank's counsel actually asserts an objection to L.L. Bean's summary judgment assertion that she worked for the company.  Despite the objection, however, she goes on to assert:  "Without waiving said objection: Admit."  (Pl.'s Opposing Statement ¶ 1, Docket No. 144.)  It is frustrating, if not maddening, that counsel would object to the assertion of an undisputed fact that she must establish on the record in order to prove her client's case.  Thinking that, perhaps, counsel wished to assert the nature and dates of Frank's employment in her own voice, I scan ahead to counsel's statement of additional facts, but, alas, discover that she has chosen to rely on L.L. Bean's statement to establish these obviously material background facts.

Frank also contends that L.L. Bean sought to broom her out of the company following its termination of David Allen.  (Stmt. ¶ 11; Opp. Stmt. ¶¶ 11; Add'l Stmt. ¶¶ 219, 222.)  Of her supervisors, only Mark Allen knew that Frank had been interviewed by L.L. Bean's Human Resources Department as part of the investigation of David Allen.  (Stmt. ¶ 18, citing Frank Dep. at 69, Docket No. 81.)  Frank testified, after a rather unprofessional squabble between counsel during her deposition, that Mark Allen never did anything to the plaintiff that she thought was in retaliation for her speaking to human resources about David Allen.  (Id. ¶ 19; see also Frank Dep. at 80-81.)  Frank believes, however, that an inference of retaliation may be drawn from the fact that Mark Allen gave her significant supervisory responsibilities after David Allen was terminated (in her words, "loaded [her] down with work") despite knowing that she was treating with a psychiatrist for emotional upset from the David Allen matter.  (Opp. Stmt. ¶ 19; Frank Dep. at 106.)  In one brief meeting with a human resources counselor (passing in the hallway), Frank reported that she was having trouble focusing on work and the counselor, Terry Keough, "just offered her some level of support and said David [Allen] is gone and now this is the time to move forward."  (Keough Dep. at 183, cited in Opp. Stmt. ¶ 22 and Stmt. ¶ 22.)  At another meeting with Keough, Frank said she had too much pressure at work, on account of treating for depression, and needed time off.  Keough advised her to "come together" and "be the good supervisor that [Keough] knew she could be[,] but if she needed time off, then, you know, . . . that was something she could pursue as well."  (Keough Dep. at 185, cited in Opp. Stmt. ¶ 22 and Stmt. ¶ 23.)  Frank nevertheless asserts that Keough's manner reflected annoyance with Frank that she was still upset over David Allen even after L.L. Bean had terminated him.  (Opp. Stmt. ¶ 23.)  In her deposition

testimony, Frank testified that Mark Allen told her a medical leave of absence at that time
would be a bad career move and also that it was a bad time for her to leave.  Frank further
testified that Mark Allen said "they were more or less still after me because of the whole
David Allen issues."  (Frank Dep. at 73, cited in Opp. Stmt. ¶ 23.)  Frank says that Mark
Allen told her that L.L. Bean wanted her to leave because they knew David Allen had
mistreated her and wanted her out of the picture.  (Add'l Stmt. ¶ 219.)  Frank's testimony
concerning Mark Allen's statements concerning L.L. Bean's motives is objected to by
L.L. Bean as double hearsay and inadmissible speculation concerning the motives of
others.  (See, e.g., Reply Stmt. ¶ 233, Docket No. 152.)  Frank's testimony concerning
Mark Allen's statements is admissible because the fact that Mark Allen was saying such
things to Frank contributes to the totality of the circumstances that may, or may not, have
given rise to a hostile work environment.  See Noviello v. City of Boston, 398 F.3d 76,
84-85 (1st Cir. 2005) (finding that insulting statements by co-workers did not present
hearsay problems because they were "not offered for the truth, but, rather, to show that
the words were spoken (and, thus, contributed to the hostile work environment")).
Frank's testimony is not, however, direct evidence of animus because it is clear from the
context that he was merely expressing his opinion about the motives of higher-level
supervisors at L.L. Bean.

     At his deposition, Mark Allen testified that he did not wish for Frank to take a
leave of absence because he needed her assistance at the store.  (Stmt. ¶ 24, citing M.
Allen Dep. at 181.)  Frank testified that "they said it was a bad career move, which was a
threat, so I stayed and I tried to do my best but it was always I never could do enough."
(Frank Dep. at 77, cited in Opp. Stmt. ¶ 24.)  According to a co-employee's testimony

(Audrey Morrison), Frank said that Mark Allen had asked Frank to stay until someone could be found to take Frank's team leader position.  (Stmt. ¶ 28.)

Another female supervisor who complained about David Allen, and who was interviewed by human resources as part of its investigation of David Allen, received merit increases and good reviews after David Allen left the company.  (Id. ¶ 33.) Following the termination of David Allen, Frank never heard anyone express any regret or unhappiness that David Allen had left the company.  (Id. ¶ 34.)  Frank does not contend that any of her supervisors or anyone in human resources vocalized anger toward her because of her involvement in David Allen's termination.  Nor does she contend that any of her coworkers ever bothered her in regard to the matter.  (Id. ¶¶ 36-37.)  Frank recollects that she retained both her title and her pay after David Allen's termination.  (Id. ¶¶ 38-39.)

One change that Frank experienced in the workplace around the time of David Allen's termination was a marked increase in her supervisory workload with the assignment of an additional team of 30 employees for her to supervise.[2]  (Opp. Stmt. ¶ 40.)  L.L. Bean notes that it assigned the leadership of the team to Frank on October 4, 2002, before she was interviewed by human resources regarding David Allen, and before David Allen was terminated, which is in tension with Frank's claim that the assignment was designed to retaliate against her for participating in that interview.  (Stmt. ¶ 42.)  Also, Frank herself asserts that it was the plan to eventually reassign the new team to someone else, thereby reducing the number of individuals under Frank's supervision and

---

[2]     Frank had applied for this supervisory assignment in 2001 and alleges that David Allen had denied it to her because she is a female.  (Stmt. ¶ 41.)  Frank asserts that it would have been a reassignment had it been given to her in 2001, whereas the way it was given to her in 2003 was as an additional assignment. (Opp. Stmt. ¶ 41.)

she also asserts that these "leadership changes" were made by L.L. Bean in a memo dated October 4, 2002, more than a month prior to the termination of David Allen, on account of "several leaders' anticipated departures from the company." (Opp. Stmt. ¶ 42; see, generally, Bilodeau Dep. at 184-187.) Nevertheless, there is a basis in the record to conclude that the reassignment made Frank's supervisory workload uncommonly heavy and that, as of her departure on leave in April 2003, Frank had held a heavier supervisory assignment for several months, a relatively long period of time—longer, at least, than her direct supervisor, Mark Allen, claims he would have liked. (Stmt. ¶¶ 44-45, 54; Opp. Stmt. ¶¶ 44, 54; Add'l Stmt. ¶ 231; see also M. Allen Dep. at 153-154.) Frank concedes that the supervisory load lightened some at an unspecified point (prior to M. Allen's resignation in March 2003) when some of the employees Frank was supervising were transferred to a new front line supervisor. (Stmt. ¶ 55; Opp. Stmt. ¶ 55; see also M. Allen Dep. at 178-179 (suggesting that as many as 30 employees might have been transferred to another supervisor.)

The changes in organizational structure that took place between October and November 2002 were an outgrowth of what L.L. Bean dubbed its "Front Line Leadership Program." Frank's former position as one of several "team leaders" was transformed into one of several "front line supervisor" positions. It appears that the departure of various team leaders in this timeframe may have been connected with the implementation of the program or with L.L. Bean's offer of severance packages in connection with the program, which, in turn, appears to have had some connection with a union drive at L.L. Bean. (Stmt. ¶¶ 85, 87-89; Bilodeau Dep. at 18-19.) According to L.L. Bean, the increase in responsibility placed on front line supervisors was accompanied by an increase in certain

undisclosed benefits.  (Stmt. ¶ 87; Bressette-Long Decl. ¶ 6.)  Frank does not address in her opposing statement whether her benefits increased or not.

Both parties offer testimony by one Pat Cuva.  Cuva testified that Frank told her that Frank felt she had been assigned the extra team to supervise because it was a disaster and "they gave it to her to fix it."  (Cuva Dep. at 42.)  Relying on this testimony, L.L. Bean asserts:  "The plaintiff believed she was assigned the additional team members because the team had become a 'disaster' and she was needed to fix the problems in the team."  (Stmt. ¶ 57.)  Frank does not deny making this statement.  Instead, she offers a qualification that Cuva also testified that Frank told Cuva she felt "other people took up where [David Allen] left off [after David Allen was terminated] and she still felt the same spite."  (Opp. Stmt. ¶ 57.)  Also before David Allen's termination, but roughly coinciding with her interview with human resources, Ray Giandrea was hired from outside of the company to work in a supervisory capacity at L.L. Bean.  Mark Allen, and possibly Mike Perkins, saw to it that Giandrea would receive training primarily from Frank, although others were involved in training him as well.  (Id. ¶¶ 50, 74; Frank Dep. at 90-91.)

In November and December 2002, Frank continued to work under a heavier supervisory workload and received from Mark Allen what she describes as "complaints" about completing her new supervisees' mid-year evaluations, which had not been completed by their prior supervisor before he quit the company.  (Id. ¶ 59; Stmt. ¶ 59.)  In addition, Frank failed to attend two meetings in this timeframe, feeling that she could not handle being in a meeting that she believed would concern David Allen and how to move forward after his termination.  (Stmt. ¶¶ 65-71.)  Initially, Bilodeau expressed concern about Frank's failure to attend, but Mark Allen indicated that he had excused Frank from

the meetings. Bilodeau agreed that it was okay for Frank to be absent in light of Frank's need to complete her mid-year evaluations. (Opp. Stmt. ¶¶ 67-68.)

Beginning around the time of David Allen's termination, Mike Perkins increased his presence on the floor at L.L. Bean. (Frank Dep. at 97-98.) Frank observed Perkins speaking with other leaders throughout her remaining time at L.L. Bean but complains that he never approached her to talk in the way he did others. (Id. at 98.) Frank expressed concern to Mark Allen about it sometime in December 2002 or January 2003 and, according to Frank, Mark Allen spoke with Perkins, who indicated that he preferred to speak with people who had smiles on their faces. (Id. at 98-99.) Frank recounts an incident in January or February 2003 in which Perkins cut in on a conversation she was having with "two other leaders" and asked how the other two leaders were doing, without acknowledging Frank and with his back turned to her. (Id. at 99; see Stmt. ¶¶ 75-83 & Opp. Stmt. ¶¶ 75-83.)

Frank sought medical care for depression in January 2003. (Add'l Stmt. ¶¶ 189, 260.) Her treatment included medication. (Id. ¶ 244.) According to Frank, she went to see Keough in human resources in January 2003 and told Keough that Frank's doctors recommended she take a leave of absence because of emotional issues related to David Allen's treatment of her and that it was "all about David Allen and the way I had been treated since David Allen and that I felt it was all related to that." (Opp. Stmt. ¶ 16; Frank Dep. at 72.) Sometime in either January or February of 2003 an "incident" occurred during a meeting that, Frank believes, demonstrated that Perkins "shunned" her and that "agreeing with the opinions of [Frank] was not a positive thing." (Add'l Stmt. ¶ 241.) Frank's testimony on the subject follows:

A.     . . . . So, in fact, there was an incident where Mike put out a question, a scenario about an employee situation and said what would you do in this situation.  No one responded so I spoke up and gave my opinion and he said, do you all agree with that, do you agree with Sheila, think it's a good idea, and I looked around the room . . . and everyone is nodding, and then he said, so, you agree with Sheila.  All motion stopped and heads like, well maybe, you know, I don't know.  So you could see that it was very obvious to me that agreeing with Sheila was not necessarily a positive thing.

Q.     Do you have reason to think that he disagreed with you for any reason other than he disagreed with the substance of what you had to say?

A.     No.  I don't know that he had disagreed with the substance of what I had to say.

(Frank Dep. at 100-101.)  During this timeframe, according to Frank, fewer of her peers went to her for advice.  (Id.)

Sometime in early 2003, in conjunction with the reorganization outlined in the October 2002 memo, Perkins, who directed the Front Line Leadership Project, concluded that there was a need for improvements in the technical and interpersonal skills of the front line supervisors in the returns and distribution departments.  (Stmt. ¶ 86.) Accordingly, he arranged for a team of three senior supervisors, included Giandrea,[3] and

---

[3]     As of March 2003, Giandrea had just become Frank's direct supervisor.  In L.L. Bean's words, Giandrea "was concerned about [Frank's] negativity, distrust, and backstabbing."  (Stmt. ¶ 103.)  Frank qualifies this statement as follows:  "Giandrea was concerned when he became Plaintiff's supervisor because she was beginning not to like him.  He knew it was going to be a difficult, high maintenance relationship."  (Opp. Stmt. ¶ 103.)  L.L. Bean's statement, some of which are admitted by Frank, reflect that the following concerns had been raised in the workplace about Frank's performance:

(1) Certain of Frank's supervisees in the audit department felt Frank was divisive and showed favoritism to some employees.  (Stmt. ¶ 96-97.)
(2) Some of Frank's fellow team leaders had been annoyed by certain of Frank's conduct, such as sitting in the chair of her supervisor, Mark Allen, in team leader meetings and announcing, "I'm going to be the supervisor today," or words to that effect.  (Stmt. ¶ 107.)
(3) Some front line supervisors did not believe that Frank had a good work ethic, and found her difficult to work with.  (Id. ¶ 109.)
(4) Frank did not keep her company cell phone on at all times and had to be reminded by her supervisors to keep it on.  (Id. ¶ 104.)

Frank asserts that Giandrea inappropriately influenced her calibration assessment by conducting "field work" after becoming her supervisor in order to gather negative feedback about her.  (Opp. Stmt. ¶¶ 106, 113.)  The record sources she cites do not reflect any inappropriate influence.  Instead, they reflect that Bilodeau filled in as a replacement for Frank's senior supervisor (Mark Allen) for purposes of the

a member of "management," Diane Bilodeau, and a human resources representative, Lisa Walker, to conduct "calibration" meetings in or around March 2003 that were designed to set a new performance standard for front line supervisors and to disseminate the new standards to the front line supervisors. (Id. ¶¶ 90, 111, 113.)  Part of that process involved assessing the front line supervisors in light of the new standards. According to L.L. Bean, the team conducting the assessments informally concluded that Frank required improvement when measured against most of the new standards. (Stmt. ¶ 126.)  Based on the record sources cited in support of this assessment, it is apparent that these assessments were never put in writing.  Instead, Giandrea and Bilodeau called Frank into an office and Bilodeau verbally informed Frank of the assessment. (Id. ¶¶ 128-129; Opp. Stmt. ¶ 128.)  Frank testified that she was surprised and upset by the number of areas in which Bilodeau stated she required improvement because she had long received only positive evaluations. (Opp. Stmt. ¶ 129, citing Frank Dep. at 129.)  The theme of the assessment appears to have been that Frank needed to build "trust and credibility" in her relationship with her supervisees.[4]  (Stmt. ¶ 133.)  According to Frank, Bilodeau stated that her notes reflected that it was "like there were two Sheilas." (Add'l Stmt. ¶ 252.)  Frank wanted to know exactly who had issues concerning her trustworthiness and credibility and Bilodeau would not say. (Frank Dep. at 129.)  Frank characterizes the meeting as "just harassment" and "insults with nothing to support them." (Add'l Stmt. ¶

---

calibration process and that she and Giandrea (newly appointed to Mark Allen's position) participated in the calibration process in an equal capacity.  Giandrea testified that, upon attaining the senior supervisor position, he conducted field work concerning the supervisors directly under him, including Sheila Frank, by talking to Frank's fellow front line supervisors and some of her supervisees.  (See Bilodeau Dep. at 260; Giandrea Dep. at 41, 59-60, 67.)  Evidently, Frank infers some inappropriate influence on Giandrea's part because Bilodeau testified, contrary to Giandrea, that Giandrea was at the calibration meetings merely to observe the process and because the calibration team did not defer sufficiently.

[4]       Frank contends that the calibration team was not suited to evaluate her because its members had insufficient knowledge and experience regarding her work history.  She also argues that the team did not evaluate her fairly.  (Add'l Stmt. ¶¶ 245-249.)

251.)  Frank cried during the meeting and Bilodeau stated that Frank could take a severance package if she wished.  (Id. ¶¶ 251-254.)  In Frank's own words:

> I said I'm concerned about my evaluation because Mark Allen is gone and I had not worked directly for anyone else there so how could they evaluate me honestly, and Ray pushed and pushed and pushed that and it was so weird because, you know, I got in there and they didn't even have it done and I was like hysterical because of the things [Bilodeau] was saying and then I just wanted to leave and [Bilodeau is] like, well, you can take a severance.  I'm like you don't even have my evaluation[5] done, why would I take a severance.  So the whole thing was just strange.

(Frank Dep. at 161.)  At some point after relating the assessment to Frank, either during the meeting or on another occasion, Frank was told to develop an "action plan" to address the trust and credibility issue.  (Stmt. ¶¶ 129-130; Opp. Stmt. ¶¶ 129-130.)  In response, Frank submitted to Giandrea, via an e-mail dated April 7, 2003, an "Action Plan for building trust and credibility" in which Frank's plan consisted on a single acronym: "DWYSYAGTD."  The acronym means "Do what you say you are going to do" and was something she had frequently heard Perkins say at L.L. Bean.  (Frank Dep. at 129; Frank Dep. Ex. 10, Docket No. 80, Elec. Attach 7.)  Giandrea told Frank that her plan was not adequate and told her to work on it.  (Stmt. ¶ 134; Frank Dep. at 130-131.)  Frank contends that the action plan was adequate because she was not told which individuals at L.L. Bean had trust and credibility issues concerning her and because Giandrea, as her supervisor, should have coached her through it.  (Opp. Stmt. ¶¶ 131-132.)  Giandrea testified during his deposition that, if he had been in Frank's shoes, he would have wanted to know who had trust issues with him and that "you can't create an action plan unless you know why they don't trust you."  (Add'l Stmt. ¶ 255; Giandrea Dep. at 102.)  Later that day (April 7, 2003), Frank went into Perkins's office to discuss what was going on

---

[5]  The calibration assessment was not on par with a formal, written evaluation.

and, according to her, Perkins told her it would be appropriate for her to "talk to [her] peers to find out if they were, you know, if this was actually something that came from them and that was my idea of resolving this."  (Add'l Stmt. ¶ 257; Frank Dep. at 103.) Frank testified that Perkins acknowledged that she had been overloaded with work. (Add'l Stmt. ¶ 302; Frank Dep. at 102.)  Frank then went to Giandrea's office and described her plan.  Giandrea told Frank that it was a bad idea.  (Frank Dep. at 103.) According to Frank, she started to cry because she did not know what to do and when she asked Giandrea about the cause of her difficulties at work, he said, "Go take a look in the mirror."  (Stmt. ¶ 136; Opp. Stmt. ¶ 136; Frank Dep. at 131.)[6]  Frank, already upset that Giandrea refused to coach her as to what would be an appropriate action plan and allegedly troubled by the fact that the meeting was taking place in David Allen's old office (which Giandrea now occupied) and hurt because the "take a look in the mirror" comment was the kind of thing David Allen might have said, walked out of work and never returned.  (Stmt. ¶ 140; Opp. Stmt. ¶ 136.)  According to Frank, "the final straw was when [Giandrea] said go take a look in the mirror when I asked for help with an action plan."  (Frank Dep. at 168:15-17.)  That day, April 7, 2003, was Frank's last day of work at L. L. Bean.  (Stmt. ¶ 4.)  When Frank failed to return from medical leave after a one-year absence, L.L. Bean terminated her employment in April 2004.  (Id. ¶¶ 5-6.)[7]

---

[6]  Frank's counsel objects to this statement on the ground that the record citation does not support the asserted fact.  My reading of Frank's deposition testimony at page 168 reflects that the statement is accurate.  Moreover, in support of her denial, Frank cites page 131 of her deposition testimony, which, if anything, reinforces L.L. Bean's statement.  I am troubled by what I consider to be an abuse of Local Rule 56(e)'s authorization to include objections in responsive statements.  It is clear from the record sources that a mere qualification would have been appropriate here.  On a general note, I would say that the tactical decision by Frank's counsel to interject in excess of 80 objections, mostly in situations where a denial or qualification would suffice, does not create an impression that the factual record favors Frank's claims.

[7]  Frank's counsel objects that Frank's leave could have been extended beyond 12 months, but does not appear to contest that L.L. Bean terminated Frank on April 11, 2004.  (Opp. Stmt. ¶¶ 5-6.)

Frank filed a Charge of Discrimination with the Maine Human Rights Commission (MHRC) on October 6, 2003.  (Stmt. ¶ 157.)  Prior to filing her Charge with the MHRC, Frank filled out an MHRC Intake Questionnaire on May 8, 2002.  (Add'l Stmt. ¶ 310.)  On the Intake Questionnaire Frank wrote:  "I was told by my supervisor that I was not promoted into a position because the operations manager [David Allen] wanted a man."  (Intake Questionnaire, Docket No. 143, Ex. 3I, Elec. Attach 4.)  Frank says that she mailed the Intake Questionnaire to the MHRC after filling it out, but does not recall the exact date on which she mailed it.  (Add'l Stmt. ¶ 317.)  She contends that the MHRC lost it.  (Frank Aff. ¶¶ 1, 6, Docket No. 142.)  In any event, the MHRC "does not believe it received any such materials prior to [October 6, 2003]."  (Reply Stmt. ¶ 314; Ryan Decl. ¶ 5, Docket No. 104.)  In her subsequent Charge, Frank complained only of the David Allen discrimination and of the failure by Mark Allen and Diane Bilodeau to do anything about it, although she also described April 7, 2003, as the latest date on which discrimination took place.  (Add'l Stmt. ¶ 315; Reply Stmt. ¶ 315; see also Charge, Docket No. 143, Ex. 4, Elec. Attach. 5.)  Frank believed the Intake Questionnaire was a complaint.  (Add'l Stmt. ¶¶ 313, 319; Frank Aff ¶ 3.)  Frank was not counseled by an attorney at the time she filled out the MHRC forms.  (Add'l Stmt. ¶ 312.)

Unlike the MHRC complaint form, the intake questionnaire form is not signed under oath.  In a declaration filed by L.L. Bean the Executive Director of the MHRC, Patricia Ryan, asserts that the MHRC's intake form is not considered to be a charge of discrimination.[8]  (Stmt. ¶ 176; Ryan Decl. ¶ 7, Docket No. 104.)  Ms. Ryan relates that

---

[8]      Frank received a packet from the MHRC that contained a flow chart labeled "Procedure for Handling of Charge of Discrimination."  ("Ex. P," Docket No. 142.)  At the top of the chart is a box containing the words "Intake/Framing the Complaint."  (Id.)  Text below the box reads: "A detailed interview with person filing the complaint to determine the specifics of the charge and the Commission's

L.L. Bean sought to dismiss Frank's administrative charge on timeliness grounds and that the MHRC did dismiss the charge on timeliness grounds, despite a March 3, 2004, letter in opposition that "made an allegation about Ray Giandrea for the first time." (Stmt. ¶ 181; Ryan Decl. ¶¶ 8-10; see also Frank's March 3, 2004 letter to MHRC, Ryan Decl. Ex. C.)  In a letter dated March 30, 2004, the MHRC notified Frank that her charge of discrimination was administratively dismissed pursuant to § 2.02(H) of the MHRC's procedural rules. (Opp. Stmt. ¶ 185; First Am. Compl. Ex. B.)  That rule justifies administrative dismissal of a charge of discrimination for various reasons, including failure to file within six months of the date of the alleged discrimination. (MHRC Procedural Rule 2.02(H)(3), Docket No. 143, Ex. Q, Elec. Attach. 34.)  The MHRC's March 30, 2004, letter does not specify which basis for administrative dismissal it relied upon.  However, the record also contains a letter written to Frank by Patricia Ryan on March 9, 2004, which is cited at paragraph 184 of L.L. Bean's statement. (Docket No. 104, Ex. D.)  In that letter, Ryan indicated that the allegations concerning Giandrea were not timely because they were not articulated until Frank's February 24, 2004, letter, which date was beyond the limitation period applicable to Giandrea's April 7, 2003, conduct.[9]

In a notice mailed July 14, 2004, the United States Equal Employment Opportunity Commission (EEOC) informed Frank that it had adopted the MHRC's

---

jurisdiction or if the alleged discrimination cannot be supported, the complaint is administratively dismissed." (Id.)  According to Frank, this chart caused her to believe "that the Intake Questionnaire was the Complaint and that she would be contacted for an interview to determine the specifics of the charge." (Add'l Stmt. ¶ 320.)  According to Frank, when several months transpired and she failed to receive a call to schedule an intake interview, she called the MHRC and learned they did not have a copy of her intake questionnaire on file.  The MHRC then sent her a complaint form and she promptly filled it out and both faxed it and mailed it in, along with her original intake questionnaire. (Add'l Stmt. ¶¶ 321-323.)

[9]     Three hundred days after April 7, 2003, was February 1, 2004.

findings and dismissed Frank's charges.  (First Am. Compl. Ex. C.)  Frank filed a civil

action in this Court on October 13, 2004.  Frank asserted the following causes of action,

by count, in her First Amended Complaint:

I.      "Hostile Work Environment, Sexual Harassment, [] Gender
        Discrimination, [and] Retaliation Under . . . Title VII";

II.     "Hostile Work Environment, Sexual Harassment, [] Gender
        Discrimination, Retaliation and Coercion Under the Maine Human
        Rights Act";

III.    Intentional Infliction of Emotional Distress;

IV.     Negligent Infliction of Emotional Distress;

V.      Punitive Damages;

VI.     Negligent Hiring, Supervision and Retention; and

VII.    Vicarious Liability.

The Court previously granted L.L. Bean's Motion to Dismiss counts III through VII based

on an application of the immunity provision of the Maine Workers' Compensation Act.

(Docket No. 10.)

## Discussion

"The role of summary judgment is to look behind the facade of the pleadings and

assay the parties' proof in order to determine whether a trial is required."  Plumley v. S.

Container, Inc., 303 F.3d 364, 368 (1st Cir. 2002).  A party moving for summary

judgment is entitled to judgment in its favor only "if the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, show that

there is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A fact is material if its resolution

would "affect the outcome of the suit under the governing law," and the dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In reviewing the record for a genuine issue of material fact, the Court must view the summary judgment facts in the light most favorable to the nonmoving party and credit all favorable inferences that might reasonably be drawn from the facts without resort to speculation. Merchants Ins. Co., 143 F.3d at 7. If such facts and inferences could support a favorable verdict for the nonmoving party, then there is a trial-worthy controversy and summary judgment must be denied. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002).

L.L. Bean contends that Frank's claims of discrimination are time barred because she failed to timely file her charges with the MHRC. (Mot. Summ. J. at 2-6, Docket No. 106.) L.L. Bean also argues that the record is insufficient to overcome the so-called Farragher-Ellerth defense, based on Frank's failure to report supervisor retaliation to a member of its human resources department. (Id. at 7-9.) Third, L.L. Bean argues that the claims are barred by Frank's failure to exhaust her administrative remedies because the scope of the charge she filed with the MHRC was narrower than the case she presents here. (Id. at 10-12.) Finally, L.L. Bean argues that the summary judgment record is inadequate to justify a trial on the merits of Frank's discrimination claims. (Id. at 12-19.) I address these argument in the order they are raised except that I find no cause to discuss the Farragher-Ellerth defense. One preliminary note is in order: Frank asserts only a hostile work environment claim in her opposition memorandum. She does not contend that any of the employment practices she experienced constitute actionable discrete, adverse employment actions for purposes of presenting a prima facie case of

discrimination under the McDonnell Douglas paradigm nor does she argue a constructive discharge theory as part of her retaliation claim.

## A.        Limitation and Exhaustion

Pursuant to 42 U.S.C. § 2000e-5(e)(1), Frank was required, in order to preserve her Title VII discrimination claims, to file a charge of discrimination with the MHRC within 300 days "after the alleged unlawful employment practice occurred."  See Lakshman v. Univ. of Me. Sys., 328 F. Supp. 2d 92, 101 (D. Me. 2004).  The MHRA is to the same effect,[10] but affords a claimant with only six months in which to file a charge. 5 M.R.S.A. § 4611.  These provisions operate as statutes of limitation.  When the unlawful employment practice alleged concerns a "discrete act" of discrimination or retaliation, a Title VII claimant must file his or her charge within the appropriate time period or the claim will ordinarily be barred.  AMTRAK v. Morgan, 536 U.S. 101, 120-122 (2002).  However, if the claimant states a claim for a "hostile work environment practice," the claim will be timely so long as one act falls within the appropriate time period and all of the acts that make up the hostile work environment practice are part of the same employment practice.  Id. at 120 ("A court's task is to determine whether the acts about which an employee complains are part of the same actionable hostile work environment practice, and if so, whether any act falls within the statutory time period.").

---

[10]        Under the Maine Human Rights Act, if a claimant fails to establish that she (a) filed a complaint with the MHRC and that the MHRC found no reasonable grounds to believe that discrimination occurred and entered an order so finding, (b) filed a complaint with the MHRC and obtained a finding that reasonable grounds exist to believe that unlawful discrimination occurred, but failed to obtain a conciliation agreement within 90 days or (c) filed a complaint with the MHRC and received a right-to-sue letter by virtue of the MHRC's failure to act within 180 days of the complaint being filed, then she is not entitled to recover attorney's fees, civil penal damages or compensatory and punitive damages under the Act.  See 5 M.R.S.A. §§ 4622, 4612(2) & (6); see also Williams v. Interstate Brand Cos., 304 F. Supp. 2d 74, 77 (D. Me. 2004) ("Failure to satisfy the requirements of section 4622 when the plaintiff seeks only attorney's fees and damages under the MHRA renders the MHRA claim moot because the plaintiff cannot be afforded any effective relief on his claim."); Gordan v. Cummings, 756 A.2d 942, 945 (Me. 2000) (holding "that when no damages or fines can be imposed, the recovery of costs alone is not sufficient to warrant the retention of the case.") (internal quotation marks omitted).

All of the allegations concerning the conduct of David Allen involve conduct that transpired prior to, at the latest, November 8, 2002,[11] the date L.L. Bean terminated David Allen's employment. Three hundred days from November 8, 2002, was September 4, 2003. Although Frank filled out the MHRC intake questionnaire on or about May 8, 2003, and purports to have mailed the form to the MHRC on or shortly after that date, Frank did not submit a verified charge (sworn or attested to under penalty of perjury) until October 6, 2003, more than 300 days after any of David Allen's employment practices were conducted and more than 300 days after L.L. Bean terminated David Allen.

EEOC regulations state that a charge of discrimination "shall be in writing and signed and shall be verified." 29 C.F.R. § 1601.9. The MHRA similarly requires that a charge of discrimination be made "under oath." 5 M.R.S.A. § 4611. Thus, I use October 6, 2003, as the operative date for limitation purposes: the day on which Frank submitted a charge under oath. Even under the MHRA's shorter, six-month period of limitation, the October 6 charge reaches back to April 6, 2003, the day before Frank's unpleasant visit to Giandrea's office. Using Title VII's 300-day period, the charge reaches back to gather up the last several months of Frank's employment at L.L. Bean.[12] Neither limitation period reaches back far enough to overlap David Allen's discriminatory employment practices.

The question is whether the facts and circumstances underlying Frank's retaliation claims are part of the same hostile work environment practice as the facts and circumstances underlying Frank's discrimination claim. I conclude that they are not.

---

[11]     L.L. Bean appears to have chosen November 8, 2002, for the sake of simplicity. It is not easy to pinpoint exactly when David Allen's last alleged discriminatory act toward Frank occurred.

[12]     Of course, the retaliation allegations concerning Giandrea's conduct were not articulated to the MHRC until it received Frank's unverified letter in March 2004, more than 300 days after April 7, 2003. For that reason, I do not fault the MHRC's decision to dismiss the case on the timeliness ground.

Although I have not recounted them in my factual statement, David Allen's alleged employment practices involved touching Frank's shoulder or back "three or more times," making a "table dancer" comment about another female worker, making a disparaging comment about "oriental" women, acting in a condescending manner toward women, and, in a discrete act of alleged discrimination, passing over Frank for a "CIT pilot project position" because David Allen did not want a woman.  (See Opp. Stmt. ¶¶ 190-208.)  In addition, Frank alleges certain acts of "coaching" by Mark Allen on how to best get along with David Allen, like telling her to phrase her comments during meetings as questions rather than statements and to "stay[] under the radar" and not to make an issue of being passed over for the CIT position because David Allen would likely retaliate against her.  Frank describes these cautionary remarks by Mark Allen as "exacerbating" the "abuse."  (Id. ¶¶ 195-196, 204.)  According to Frank, her emotional upset grew out of working under the cloud of David Allen's management, which silenced her and made her feel subservient and "put in her place" time and again.  (Id. ¶¶ 208-212, 222.)  All of these facts and circumstances concern David Allen's management practices and the failure of Mark Allen or Diane Bilodeau to intercede on Frank's behalf.  The retaliation theory, on the other hand, involves allegations that L.L. Bean (through Bilodeau, Mark Allen, Giandrea and/or Perkins), rather than overlooking or "exacerbating" a manager's gender-biased employment practices, actively retaliated against Frank based on her participation in the human resources investigation that lead to David Allen's termination or, perhaps, for speaking out in criticism of L.L. Bean's failure to sack David Allen sooner or, perhaps, for Frank's complaints concerning her emotional condition and her desire to take a leave of absence.  As the First Circuit Court of Appeals observed in

<u>Noviello</u>:  "Even when retaliation is derivative of a particular act of harassment, it normally does not stem from the same animus.  Most often, retaliation is a distinct and independent act of discrimination, motivated by a discrete intention to punish a person who has rocked the boat by complaining about an unlawful employment practice."  398 F.3d at 87.  Because Frank's discrimination and retaliation claims do not rely on the same hostile work environment employment practice, the timely retaliation theory does not gather up the untimely discrimination theory to make one comprehensive hostile work environment claim.  To the extent that the claims recited in counts I and II seek an award of damages for "sexual discrimination" or "sexual harassment" or a "hostile work environment" based on David Allen's employment practices, those claims are time barred.[13]

---

[13]    Frank and L.L. Bean spar over whether Frank is entitled to an equitable exception to the statute of limitation based on the "continuing violation doctrine."  Equitable exceptions to the limitation bar are available only for continuing violations comprised of serial or systemic discrimination.  Frank argues that the discrimination she experienced at L.L. Bean falls under both categories.  (Opp. Mot. at 3-5, 9-10.)  "Under the serial violation branch of the continuing violation doctrine, a plaintiff may link a number of discriminatory acts emanating from the same discriminatory animus, even though each act constitutes a separate wrong."  <u>Centro Medico del Turabo, Inc. v. Feliciano de Melecio</u>, 406 F.3d 1, 7 (1st Cir. 2005).  This exception does not apply in this case because the animus underlying Frank's David Allen discrimination claims is distinct from that underlying her post-David Allen retaliation claims.  Furthermore, "[i]n order for the serial violation theory to apply, the act that falls within the limitations period must itself constitute an actionable violation."  <u>Id.</u>  Thus, one might say that it "follows inexorably that if [Frank has] failed to state an independently actionable claim based on [a post-David Allen hostile work environment, she] cannot rely on that incident to anchor the rest of [her] claims."  <u>Id.</u>  As for systemic violations, they may be recognized when an employer "maintains a discriminatory policy, responsible for multiple discriminatory acts that fall outside the limitations period."  <u>Crowley v. L.L. Bean, Inc.</u>, 303 F.3d 387, 405 (1st Cir. 2002) (quoting <u>Rivera-Rodriguez v. Frito Lay Snacks Caribbean</u>, 265 F.3d 15, 21 (1st Cir. 2001)).
        Frank argues that her discrimination and retaliation claims are part of a unified hostile work environment that she describes, varyingly, as "non-response" or "promotion of abuse" or as "L.L. Bean's practice of refusing to rectify a discriminatory practice . . . it is aware of and discouraging employee complaints through fear of adverse consequences."  (Opp. Mot. at 9.)  Putting aside the notable fact that L.L. Bean terminated David Allen after its investigation, which tends to undermine Frank's "non-response" theory, Frank's factual presentation is not well suited to proving the existence of a monolithic policy that could serve as the cause of all her troubles at L.L. Bean.  Although David Allen's practices appear to have affected a number of women in the workplace (Opp. Stmt. ¶¶ 213-214), Frank has not presented any evidence that the policy she describes resulted in a retaliatory, adverse employment action or a hostile environment for any of the other individuals who participated in the investigation.  Instead, the retaliation Frank alleges appears to have befallen her alone.  This fact (or hole in the record) is inconsistent with the stated policy.  <u>See</u> <u>Grotlisch v. Gen. Dynamics Def. Sys.</u>, 28 Fed. Appx. 3, 5 (1st Cir. 2002) (unpublished)

L.L. Bean's motion also raises an interesting exhaustion issue.  "A Title VII suit may extend as far as, but not beyond, the parameters of the underlying administrative charge."  Jorge v. Rumsfeld, 404 F.3d 556, 565 (1st Cir. 2005).  Thus, a civil action is "constrained" by the allegations pressed before the agency in the sense that "the judicial complaint must bear some close relation to the allegations presented to the agency."  Id. L.L. Bean argues that Frank's retaliation claim was not exhausted because the charge she filed with the MHRC described only David Allen's employment practices and because Frank failed to check the retaliation box on the charge form.  (Mot. Summ. J. at 10-11.) Frank fails to respond to this argument in her opposition memorandum.  I am not convinced, however, that her failure to take a position on the "failure to exhaust" defense compels an entry of judgment for L.L. Bean.  Compare Mullen v. St. Paul Fire & Marine Ins. Co., 972 F.2d 446, 452 (1st Cir. 1992) (holding that failure to file an opposition to a motion for summary judgment "does not, in itself, justify entry of summary judgment") with Grenier v. Cyanamid Plastics, Inc., 70 F.3d 667, 678 (1st Cir. 1995) (treating as waived on appeal a particular theory advanced in support of the appellant's discrimination claim that was articulated in the appellant's complaint but was not articulated or supported in the summary judgment opposition brief filed in the district court).

In Clockedile v. N.H. Dep't of Corr., 245 F.3d 1 (1st Cir. 2001), the First Circuit Court of Appeals held that a retaliation claim was preserved where the retaliation was

_____

(observing that a policy is a "general practice aimed at members of a protected class" and that the claimant failed to identify a policy because his case for discrimination was alleged to arise "solely from the employer's treatment of him alone":  "discrete discriminatory acts against an individual employee, even if repeated, do not constitute a general practice (and, therefore, do not constitute a systemic violation)"); Provencher v. CVS Pharm., 145 F.3d 5, 14 (1st Cir. 1998) ("Because evidence of verbal and physical harassment, overall decreased salary, and the company's failure to remedy indicate acts intended to harm and humiliate [the plaintiff] only, and do not show a policy or practice by the company, . . . [the plaintiff's] claim is most appropriately framed as a serial violation."); Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 184 (1st Cir. 1989) ("General references to some vague, undefined policy of discrimination are not . . . sufficient to make out a . . . showing that a discernible discriminatory policy was in effect.").

"reasonably related to and [grew] out of the discrimination complained of to the agency."
Id. at 6.  Clockedile filed an EEOC complaint while she was still an employee and before
any of the retaliation she eventually alleged in her civil action had come to pass.  The
Court of Appeals indicated that that circumstance did not prevent her administrative
charge from serving to exhaust her retaliation theory because the retaliation in question
grew out of the discrimination complained of to the agency.  Id. at 5.  Thus, Clockedile
was not required to file an additional administrative charge.  Unlike Clockedile, Frank
filed her charge with the MHRC after all of the allegedly unlawful employment practices
were performed.  Thus, it is difficult to understand why Frank did not describe in her
October 6, 2003, charge of discrimination any of the more timely employment practices
that she now points to in an effort to portray a long-term hostile work environment.  The
MHRC apparently had the same question.  Following Frank's letter to the MHRC in
opposition to L.L. Bean's request to dismiss the administrative charge as untimely,
Executive Director Ryan wrote in regard to Frank's description of Giandrea's "look in the
mirror" comment that "[i]t is now too late to complain about that alleged statement."
(Docket No. 104 Ex. D.)  In effect, because not one of the employment practices asserted
by Frank was reported to the MHRC within 300 days of its occurrence, the MHRC
declined to investigate and dismissed Frank's case.

     If the court were to entertain L.L. Bean's failure to exhaust challenge, it would
need to determine whether Frank's filing of her October 6, 2003, charge concerning L.L.
Bean's employment practices pertaining to David Allen's management was sufficient to
exhaust administrative remedies with regard to allegedly retaliatory employment
practices committed after David Allen's sacking but not articulated in the charge and not

raised within 300 days of their occurrence.  The standard applicable to that question is whether the retaliatory practices were "reasonably related" to or "grew out of" the David Allen issues.  <u>Clockedile</u>, 245 F.3d at 6.  I have already discussed why I conclude that these two claims do not describe one comprehensive hostile work environment employment practice under <u>Morgan</u>, but I am concerned that the "reasonably related" and "grew out of" language of <u>Clockedile</u> might describe a more malleable standard.  It might be that the Court of Appeals would want the exhaustion analysis to parallel the continuing violation analysis, but perhaps not.  I have decided to pass on this question because I conclude that the hostile work environment claim that remains in this case is not actionable in any event.

## C.      The Merits of the Retaliation Claim

        Among other arguments, L.L. Bean contends that Frank's "retaliation claim" is insufficient as a matter of law because the addition of new supervisory responsibilities and the critical calibration assessment were not "adverse employment actions."  (Mot. Summ. J. at 12-19.)  Frank responds that the addition of a heavy supervisory work load and the onset of "continuous criticism" despite her long-term positive work history gave rise to a poisonous atmosphere sufficient for the jury to find that a hostile work environment existed for her.  (Pl.'s Opposition Mem. (Opp. Mem.) at 16-22, Docket No. 125.)  Thus, Frank does not articulate her claim as turning on any "discrete" adverse employment action (perhaps because she concludes that a discrete act claim would be untimely or unexhausted); she contends only that an actionable hostile work environment existed for her.

"Under Title VII of the Civil Rights Act of 1964, . . . it is unlawful 'for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII], or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII].'" Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 269 (2001) (paraphrasing § 42 U.S.C. § 2000e-3(a)).  The MHRA proscribes essentially the same conduct.  See 5 M.R.S.A. § 4572(1)(A).

Because Frank does not advance any direct evidence of retaliation, her retaliation claim is fodder for the McDonnell Douglas mill.   Bishop v. Bell Atl. Corp., 299 F.3d 53, 58 (1st Cir. 2002).  In order to state a prima facie case[14] of unlawful retaliation under either Title VII or the MHRA, Frank must demonstrate (1) that she engaged in protected conduct, (2) that she suffered an adverse employment action, and (3) that the two were causally linked.  Noviello, 398 F.3d at 88 (Title VII); Bowen v. Dep't of Human Serv., 606 A.2d 1051, 1054 (Me. 1992) (MHRA).  If she were to succeed in this endeavor, the burden would shift to L.L. Bean "to articulate legitimate, non-retaliatory reasons for its employment decisions." Bishop, 299 F.3d at 58.  Thereafter, the burden would return to Frank, this time to demonstrate that L.L. Bean's non-retaliatory justification for imposing any adverse employment action is pretextual and that the adverse action was a product of retaliatory animus.  Id.

L.L. Bean appears willing to concede that Frank's participation in L.L. Bean's investigation was protected under both Title VII and the MHRA, which satisfies the first element of the prima facie test.  L.L. Bean argues, however, that Frank did not experience

---

[14]     Frank does not suggest in her opposition memorandum that she has any direct evidence of retaliation.

24

an adverse employment action or a hostile work environment, and denies that any such harm, if it occurred, was caused by Frank's protected conduct.

    1.     *Hostile Work Environment as an Adverse Employment Action*

Frank describes her retaliation claims as hostile work environment claims.  (Opp. Mem. at 16.)  She begins her discussion of her claims by explaining that David Allen had created an abusive environment for her to work in and that everything done by other L.L. Bean supervisors was in "exacerbation and promotion of the abuse."  (Id.)  I have already concluded that this unified theory of the case is not available to Frank due to the strictures set by the limitation provisions of Title VII and the MHRA.  Therefore, I consider only the facts underlying the retaliation theory as informing the hostile work environment claim.

Frank asserts that the retaliation began with the decision to assign her "two teams of 30 plus employees and Audit to supervise, double the norm, after D. Allen was fired," which decision she attributes to both Mark Allen and Bilodeau.  (Id. at 17.)  I am somewhat concerned about treating this supervisory assignment as the first act of alleged retaliation because a work assignment is generally understood to be a discrete act, see Jensen v. Frank, 912 F.2d 517, 522-23 (1st Cir. 1990), and this discrete act occurred prior to Frank's human resources interview and beyond the temporal bar set by the respective statutes of limitation.  In any event, I include this act because it appears that the added workload served as the primary stressor in Frank's work experience.  Thus, Frank builds on this heavy supervisory workload backdrop by asserting that she "was then for the first time in her career subjected to continuous criticism . . . for not completing the mid-year [evaluations] fast enough and for not attending meetings she had been excused from" on

account of her need to complete the mid-year evaluations. (Opp. Mem. at 18.) Frank argues that she "complained . . . repeatedly about the workload . . . but no action was taken." (Id.) Frank also complains about being asked to train Ray Giandrea, who started working at L.L. Bean about a week before David Allen was fired, roughly at the beginning of November 2002. (Id.) The record reflects that being asked to train a new supervisor is typically considered a compliment, but Frank says it was more bitter than sweet for her because of all the other work she had to do. (Id.; Frank Dep. at 90-91.) Frank also faults Giandrea for finding that she had inappropriately allowed Pat Cuva to access "ShopView," a computer program used by L.L. Bean to keep track of time and attendance information about employees, which she describes as a false accusation that was never investigated or substantiated. (Opp. Mem. at 19; see Stmt. ¶¶ 101-102; Opp. Stmt. ¶¶ 101-102.) Next, Frank complains that Mark Allen, Bilodeau and Keough did not encourage her to take medical leave in January 2003 when she first raised the possibility of taking such leave. (Opp. Mem. at 19.) After that, Frank contends that the calibration assessment she received was improperly colored by Giandrea and that he inappropriately asked some of Frank's supervisees about Frank when he became her senior supervisor. (Id. at 19-20, relying on Opp. Stmt. ¶¶ 106, 113.) Layered atop these complaints are the unfavorable verbal calibration assessment she received from Bilodeau, the suggestion that she consider a severance package after she went "hysterical" during the verbal assessment, the imposition of the action plan, Giandrea's refusal to treat her acronym action plan as sufficient or to explain to her how to devise an acceptable action plan and his statement, made "straight in [Frank's] red blotchy face" to "take a look in the mirror" after "driving [her] to tears." (Opp. Mem. at 20-21.) [15]

---

[15]     Frank also complains that "Perkins added insult to injury by demeaning, humiliating and singling

L.L. Bean argues that the record will not support a finding that L.L. Bean imposed any adverse employment action on Frank because her title, pay and responsibilities did not change after she participated in the protected conduct concerning David Allen. (Mot. Summ. J. at 14.)  L.L. Bean runs through the remaining complaints as well, noting, in particular, that imposition of the action plan was not an adverse employment action, either, because it was "standard company policy" to use action plans "to correct perceived deficiencies."  (Id. at 19.)  Frank evidently agrees that her evidence will not satisfy the "adverse employment action" standard because she does not assert that any of her several plaints is capable of satisfying her prima facie burden.  Instead, she contends that the several slings and arrows that she was subjected to gave rise to a hostile work environment.  (Opp. Mem. at 16-22.)

"[S]exual harassment is actionable under Title VII only if it is so severe or pervasive as to alter the conditions of the victim's employment and create an abusive working environment."  Breeden, 532 U.S. at 270 (internal quotation marks omitted). "Workplace conduct is not measured in isolation; instead, whether an environment is sufficiently hostile or abusive must be judged by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it

---

[her] out . . . in the leadership meetings he took over from D. Allen."  (Id. at 18.)  I reproduced in my fact recitation Frank's actual testimony concerning Perkins's treatment of her at a leadership meeting.  That testimony reflects that Frank herself did not know whether Perkins had criticized her or not and the description of the incident that she gave at her deposition does not, in my view, support the kind of inference she articulates in her memorandum.  Frank also asserts that it was abusive to make her aware of complaints made against her by "dysfunctional problem employees who complained about everything." (Id.)  The record cites offered by Frank reflect that this concerns the complaints made by audit employees concerning Frank's alleged favoritism toward her friend, Pat Cuva.  I alluded to these facts in footnote 3.  I fail to see how it was abusive to inform Frank, a supervisor, about her supervisees' criticism.  Frank suggests that Bilodeau was behind these criticisms by stating that Bilodeau did not bother "to address any of these criticisms" (Id. at 18), but her opposing statement asserts that the complaints were made directly to Mark Allen (Opp. Stmt. ¶ 96).

unreasonably interferes with an employee's work performance."  Id. (internal quotation marks omitted).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." Harris v. Forklift Sys., 510 U.S. 17, 21 (1993) (internal quotation marks omitted).  In Noviello, the First Circuit Court of Appeals held that proof of a hostile work environment can substitute for prima facie proof of an adverse employment action.  398 F.3d at 89.

Stripped of counsels' hyperbole, the record reflects that Frank experienced an increase in supervisory workload in early- or mid-October 2002 in conjunction with L.L. Bean's Front Line Leadership Program, an internal realignment that transformed Frank's "team leader" position into a "front line supervisor" position and coincided with the departure of some of her fellow team leaders.  Following her assumption of additional supervisory responsibilities, Frank opined to her friend, Cuva, that an additional team was assigned to her because it had become a disaster and L.L. Bean needed her to fix the team.  Shortly after the realignment, on October 31, 2002, human resources interviewed Frank as part of its investigation concerning the treatment that her supervisor and long time nemesis, David Allen, accorded to women in the workplace.  Meanwhile, Frank was asked to help train Ray Giandrea to serve as a supervisor in returns.  Eight days later, on November 8, 2002, David Allen's employment was formally at an end.  The balance of 2002 appears to have been largely uneventful, though Frank continued to labor under a heavy supervisory workload and had to weather being prodded to complete her mid-year evaluations, as well as Bilodeau's concern over Frank's failure to attend a couple of leadership meetings scheduled by Perkins, a vice president higher up the organizational

hierarchy than both Bilodeau and Frank.  Coinciding with her failure to attend these meetings, Frank experienced what might be characterized as the "cold shoulder" coming from Perkins and, possibly in December of that year, an indication from Mark Allen that Perkins had been avoiding her because she did not have a smile on her face.  Although Frank considered the workplace to be a "spiteful" environment, nothing had occurred to Frank in this timeframe that could reasonably be characterized as abusive or humiliating.

In January 2003, Frank informed human resources that Frank's doctors recommended she take a leave of absence because of emotional issues related to David Allen and the way she was being treated at work since David Allen's termination.  No one encouraged Frank to take medical leave, however, and she decided to stick it out for fear that taking leave at that time would have been held against her.  At some point possibly around this time, Mark Allen let Frank know that some of her audit supervisees had been grousing that she showed favoritism to a friend of hers.  Then Frank attended a meeting at which Perkins presided and she spoke up and gave her opinion.  Perkins asked whether others agreed with Frank's opinion, without indicating what he thought of the opinion.  Frank never determined whether Perkins agreed with her opinion or not, but she started to observe that her peers sought her out less frequently for advice.

Sometime in either February or early March 2003, Frank's supervisory load lessened when some of her supervisees were transferred to another supervisor.  Possibly in this timeframe, possibly earlier, Frank was told to make sure she kept her work-assigned cell phone activated when she was at the store.  At various points between October 2002 and March 2003, Frank would confide in or complain to Mark Allen that she felt she was being treated poorly or unfairly.  Mark Allen expressed the opinion that

L.L. Bean might be trying to broom her out because she had experienced mistreatment from David Allen.

Mark Allen left the company or was terminated in March 2003 and Giandrea ascended to Mark Allen's senior supervisor post.  Giandrea started conducting "field work" about Frank, but there is no indication in the summary judgment record that Frank was aware that this field work was going on, or that Giandrea was conducting his field work solely with regard to Frank.  According to Frank, there was some reason for Giandrea to know at this time that Frank "was beginning not to like him."  Quite possibly, the reason for this, whatever it was, caused Frank some level of extra anxiety.  Later that month Perkins's Front Line Leadership Project got underway and meetings were conducted in which Frank and her peers were discussed and assessed by the project team.  Again, although these events occurred, there is no indication that these events impacted Frank's day-to-day work experience until she was verbally informed of the results in April.  Although Frank may have been unhappy with the "treatment" she received at L.L. Bean, there simply is no evidence that would reasonably support a finding that she was being subjected to abuse or humiliation in January, February or March.  I also note that, as of the end of March, Frank's work experience seemed improved in certain important respects: she was no longer training Giandrea and her supervisory workload had been reduced to some extent.

Frank contends that Mark Allen's expression of an opinion about L.L. Bean's motives is, for present purposes, especially probative of a hostile work environment.  (Opp. Mem. at 21.)  I disagree.  Although Mark Allen's statements evidently contributed to Frank's perception that she was being subjected to retaliation and were unprofessional

insofar as Mark Allen should have addressed the issue directly with higher level supervisors, the statements do not tend to demonstrate an abusive or humiliating environment.  But these several incidents do not yet complete the picture.

On Friday, April 4, Bilodeau, in Giandrea's presence and at his request, verbally informed Frank that the assessment had been unfavorable and that there were "trust and credibility" issues for her to deal with.  Frank became, in her words, hysterical, because she felt the criticism was unjust and because Bilodeau would not tell her who among her peers or supervisees had given negative feedback about her.  After Frank became hysterical, Bilodeau stated that Frank could take a severance package.  Frank retorted that there was no reason for her to take a severance package when she had not yet received a written evaluation.  Possibly at that point she was informed that she would need to devise an action plan to address the trust and credibility concern, although that requirement may have been communicated sometime over the next three days.  On Monday, April 7, Frank emailed her "DWYSYAGTD" action plan to Giandrea, who was not impressed.  Later that day he told her to work on it some more and rejected her suggestion that she ask each of her supervisees whether he or she was a source of the complaints about trust and credibility.  Frank began to cry and asked Giandrea about the cause of her difficulties at work, to which Giandrea responded, "Go take a look in the mirror."

There can be little question that April 2003 was a bad month for Frank at L.L. Bean, on account of the negative calibration assessment she received, acting hysterical in front of her supervisors, the requirement that she develop an action plan and Giandrea's callous statement that Frank should "take a look in the mirror" in response to Frank's inquiry about the source of her problems at L.L. Bean.  Nevertheless, although Frank

apparently felt that these events made her workplace insufferable,[16] she must also establish that the work environment she experienced was objectively hostile.  I simply cannot conclude that the addition of the negative assessment, the action plan and Giandrea's callous comment are sufficient to permit a jury to find that Frank was subjected to a hostile work environment.  Essentially, I fail to see how the events described in this case could fairly be described as giving rise to a workplace "permeated with [retaliatory] intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the condition of [Frank's] employment and create an abusive working environment."  Harris, 510 U.S. at 21.  The case most frequently cited by Frank, Noviello, tends to demonstrate how relatively mild Frank's work environment was.  In Noviello, the plaintiff's supervisors tolerated an environment in which the plaintiff was subjected to reckless conduct that put her physical well-being in jeopardy, including being shut out in the cold weather and narrowly missed by a motor vehicle that was supposed to transport her but was, instead, driven away as she tapped on the window, all for reporting that a popular co-employee forcibly pulled her bra off.  398 F.3d at 82-83.  Moreover, the fact that the co-workers' actions were done in retaliation for protected conduct was unquestioned.  In Che v. Massachusetts Bay Transportation Authority, 342 F.3d 31 (1st Cir. 2003), the First Circuit Court of Appeals observed that the jury, as a "general matter," should determine whether a course of conduct was threatening or humiliating, interfered with the plaintiff's performance or impacted her psychological

---

[16]        Frank describes Giandrea's comment as the final straw, but she does not argue that she was subjected to conditions that would support a constructive discharge finding.  That, of course, does not undermine her hostile work environment claim because the constructive discharge standard is more difficult to meet than the hostile work environment standard.  See Pa. State Police v. Suders, 542 U.S. 129, 133 (2004) (describing the constructive discharge theory as requiring a "further showing" beyond that necessary to support a hostile work environment claim).

well-being, id. at 40, but the Court of Appeals also observed in Noviello that the Court's "function is one of screening, that is, to determine whether, on particular facts, a reasonable jury could reach such a conclusion," 398 F.3d at 94.  In my view, permitting a finding of a hostile work environment on this collection of facts and circumstances would unduly dilute the significance that should be accorded to terms like "intimidation," "ridicule," "insult," "abuse" and "humiliation."  In making this determination, I am mindful that "work places are rarely idyllic retreats,"[17] Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996), and that "not everything that makes an employee unhappy qualifies as . . . actionable," Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996) (concerning what constitutes an adverse employment action).  I am particularly concerned in this case by Frank's failure to present evidence that her supervisees and peers did not, in fact, raise trust and credibility issues with regard to her leadership skills,[18] which critiques lay at the core of Frank's negative assessment and were the focus of her action plan.  In the absence of such evidence and in the absence of any objectively abusive or humiliating treatment, I am not persuaded that Frank can build a hostile environment claim based on "unwarranted negative job evaluations."  See Gu v. Boston Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002).  Additionally, Frank's concession that she reacted hysterically to the calibration assessment tends to place in context the imposition of an action plan.  Finally, when placed in the context of this hysterical response to

---

[17]    One Circuit has gone so far as to say: "the workplace that is actionable is the one that is hellish." Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997).  I do not apply that standard here, but rely instead on the abusive and humiliating adjectives prescribed by the Supreme Court.  I note the Seventh Circuit's characterization of the hostile work environment standard only to emphasize that mere workplace unpleasantness falls well short of demonstrating abusive or humiliating conditions.  See also Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 977 (7th Cir. 2004).

[18]    There is no evidence that any of Frank's front line peers or supervisees harbored, let alone expressed, resentment toward her on account of her participation in the human resources interview or on account of David Allen's termination.  The record is also devoid of evidence that anyone Frank worked with, including the individuals in her supervisory chain, was upset by David Allen's termination.

criticism, Frank's submission of a single acronym for an action plan and her suggestion that she ask her supervisees not what she might do to encourage their trust but whether they were the cause of her negative assessment, I fail to see how any reasonable person could conclude that Giandrea's statement that Frank should "take a look in the mirror" to see the source of her troubles at L.L. Bean (made in the privacy of Giandrea's office) rose to the level of abusive or humiliating treatment as opposed to a mere "offensive utterance." This solitary quip certainly pales in comparison to a racial epithet or other overtly hostile speech and neither Title VII nor the MHRA are meant to serve as workplace civility codes. Harris, 510 U.S at 21 ("'mere utterance of an . . . epithet which engenders offensive feelings in a employee,' does not sufficiently affect the conditions of employment to implicate Title VII") (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986)); see also Noviello, 398 F.3d at 92 (stating that the anti-discrimination laws and anti-retaliation laws "were not enacted to create or enforce a 'general civility code'") (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998)).

   2. *Causation and pretext*

  The case law is unclear whether a finding that a retaliatory hostile work environment exists would serve to short circuit the McDonnell Douglas analysis. See Noviello, 398 F.3d at 89 (addressing the question "whether a hostile work environment can constitute a retaliatory adverse employment action"). Conceptually, both the issue of causation and the issue of pretext would be wrapped up in the hostile work environment analysis, which permits consideration of the temporal relationship between protected activity and the commencement of hostile treatment in the workplace and whether

negative evaluations were warranted.  In any event, I have concluded that a hostile work environment claim is not made out and, for this reason, I do not engage in a discussion of causation and pretext, although I note that proof of both issues would be exceedingly difficult on the existing record.  First, the reorganization of the team leader positions into front line leadership positions and the assignment of additional supervisees to Frank grew out of a systemic change at L.L. Bean that was put down on paper before Frank engaged in her protected interview with human resources.  Cf. Breeden, 532 U.S. at 272 ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality.")  In addition, Frank does not deny that she confided in a friend that she, subjectively, thought the increased supervisory workload was due to her ability to fix the new team that was assigned to her, not due to talking with certain human resources personnel about her issues with David Allen.  Although the increased supervisory workload was a burden and caused Frank to fall behind in her evaluations and to complain about overwork, the record also reflects that L.L. Bean decreased Frank's supervisory load in March. Furthermore, several months had passed since Frank's interview with human resources before she received her unfavorable calibration assessment and that assessment was drawn from feedback expressed to the calibration team members by Frank's peers and supervisees.  Frank has not presented the kind of evidence that would generate a genuine issue of material fact whether her peers and supervisees, in fact, expressed such trust and credibility concerns about Frank's leadership.  Nor has she generated evidence that the peers and supervisees expressed these complaints because of their dissatisfaction with her

participation in the human resources interview (assuming they had any knowledge of it), thereby contributing to a finding that a retaliatory animus caused the negative assessment.

## Conclusion

For the reasons set forth above, I recommend that the Court GRANT L.L. Bean's motion for summary judgment (Docket No. 106) against the remaining counts (I and II) of Frank's First Amended Complaint.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated: January 9, 2006